IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ANGEL ITURBE-GONZALEZ,<br><br>Defendant. | CR 14–23–BU–DLC<br><br><br><br>ORDER |

Before the Court is Defendant Angel Iturbe-Gonzalez's motion to suppress. For the reasons explained, the Court denies the motion.

## Background

In September 2014, Iturbe-Gonzalez was indicted for Conspiracy to Distribute Controlled Substances in violation of 21 U.S.C. § 846 and Possession with Intent to Distribute Controlled Substances in violation in 21 U.S.C. § 841(a)(1). Trial is scheduled for April 27, 2015.

At approximately 5:15 p.m. on April 14, 2014, Montana Highway Patrolman Daniel S. Amundson ("Trooper Amundson") pulled over a vehicle for

1

suspected speeding in a construction zone.[1] The vehicle was a silver Mitsubishi Endeavor, an SUV, with Washington plates. The posted speed limit was 45 MPH and Trooper Amundson's radar clocked the Mitsubishi's speed at 56 MPH. Trooper Amundson approached the Mitsubishi on the right. There was one male occupant driving the vehicle. Trooper Amundson informed the driver of the reason for the stop and asked the driver, subsequently identified as Angel Iturbe-Gonzalez, for his driver's license, registration and proof of insurance. Trooper Amundson observed that the inside of the vehicle was clean, there were clothes hanging in the back seat that consisted of clean button down shirts and urban type casual clothing, and in the back cargo area there were two suitcases, clean workout clothes, and athletic shoes. Trooper Amundson asked if Iturbe-Gonzalez was the owner of the vehicle and Iturbe-Gonzalez responded that he was and that he had purchased it a couple of months prior. Trooper Amundson directed Iturbe-Gonzalez to return to his patrol car with him, as was his custom.

Iturbe-Gonzalez exited the Mitsubishi, shook hands with Trooper Amundson and then entered the patrol car. He sat in the front passenger seat with Trooper Amundson in the driver's seat. Iturbe-Gonzalez's English was imperfect,

---

[1] The Court relies primarily on the dash cam video from Trooper Amundson's patrol car (Ex. I) for the following factual recitation. Some additional details, such as full-names of officers, etc., are taken from the police reports filed with Iturbe-Gonzalez's motion.

but conversational.

In the patrol car, Trooper Amundson examined the documents given to him by Iturbe-Gonzalez, which consisted of an expired California driver's license application, a driver's license out of the Mexican State of Baja California, a registration receipt for the Mitsubishi listing Francisco Mercado as the registered owner of the vehicle, and a Progressive proof of insurance card for the vehicle listing Francisco Mercado and Julia Cadena as the insureds. After some brief friendly conversation, Trooper Amundson explained that he was going to issue a warning to Iturbe-Gonzalez for speeding.

Trooper Amundson then began working on the warning card. Trooper Amundson asked Iturbe-Gonzalez where he was coming from and going to. Iturbe-Gonzalez responded that he was coming from Seattle and headed to "Dakota" for work. (Ex. I at 5 min.) Trooper Amundson asked what kind of work Iturbe-Gonzalez was going to do in Dakota. Iturbe-Gonzalez responded that he was going to do construction. Trooper Amundson asked what kind of construction work Iturbe-Gonzalez specialized in, and Iturbe-Gonzalez said that he didn't specialize in anything but could do most any kind of construction work. Iturbe - Gonzalez also stated that he has a degree in nutrition and personal training and that is the kind of work he prefers. Trooper Amundson asked if Iturbe-Gonzalez

had ever traveled to Dakota before. Iturbe-Gonzalez explained that this was his first time. Trooper Amundson asked where in Dakota he was traveling to, and Iturbe-Gonzalez explained that he did not know, but that the address was in his phone. Trooper Amundson asked if Iturbe-Gonzalez had a work visa or if he was a U.S. citizen. Iturbe-Gonzalez replied no, but that his wife was a U.S. citizen. Trooper Amundson asked if he had tried to get his Washington driver's license renewed and Iturbe-Gonzalez said no. Trooper Amundson then asked who owned the Mitsubishi and Iturbe-Gonzalez explained that the registered driver, Francisco Mercado, is his friend and that he purchased the vehicle from Mercado about two months prior. This exchange inside the patrol car while Trooper Amundson worked on the warning card and before he requested a records check from dispatch took approximately five minutes. The exchange was casual in tone, with some interspersed conversation about Iturbe-Gonzalez's interest in body building and mixed martial arts.

Trooper Amundson then requested a records check on Iturbe Gonzalez from dispatch. The wait for the return on the records check took approximately 10 minutes. While waiting on the return from dispatch, the two continued to converse. Trooper Amundson asked where Iturbe-Gonzalez grew up, and Iturbe-Gonzalez said that he grew up in Mexico City. Trooper Amundson asked what

4

kind of work Iturbe-Gonzalez did in Seattle, and Iturbe-Gonzalez responded that he worked general construction. Trooper Amundson asked if Iturbe-Gonzalez had a wife, and he responded that he has a wife and two kids. Trooper Amundson asked if Iturbe-Gonzalez had any tools for construction, and Iturbe-Gonzalez said that he didn't have any tools because his friend in Dakota said that he didn't need any. Trooper Amundson asked how long Iturbe-Gonzalez planned to stay in Dakota. Iturbe-Gonzalez responded that he planned to stay for at least two months.

Trooper Amundson then received a phone call from dispatch. He asked that Iturbe-Gonzalez step out of the patrol car and return to his Mitsubishi. Iturbe-Gonzalez complied and Trooper Amundson answered the call. Dispatch explained that it had no information on the vehicle but that Iturbe-Gonzalez had a prior arrest in California in December of 2012 for felony possession of controlled substance for sale, possession of controlled substance while armed, and that he had been released pending further investigation. Dispatch asked if he wanted any assistance. Trooper Amundson indicated that he might call county to see if a drug dog could assist.

Trooper Amundson then called local dispatch for a county K-9. While on the radio with county requesting a K-9, his cell phone rang, but the call did not go

5

through. Dispatch then contacted Trooper Amundson again, and provided more details about the location of Iturbe-Gonzalez's prior arrest in California. Approximately forty seconds later, while Trooper Amundson was printing paperwork for the warning card, Trooper Amundson's cell phone rang again. It was Gallatin County Sherriff's Deputy Dave Johnson calling to say that he was free and could bring a K-9. Trooper Amundson explained that he had pulled someone over who said that he was headed from Washington to North Dakota but didn't have a lot of details about why he was going there and that he also had a recent arrest for trafficking, felony possession, and being armed. Trooper Amundson explained his location and stated that he might not need the K-9, and that he would contact him again if he felt he needed the K-9. Deputy Johnson offered to come anyway. Attending to this various business with dispatch, Deputy Johnson, and printing took Trooper Amundson approximately three minutes.

Trooper Amundson then exited the patrol car and asked that Iturbe-Gonzalez join him by the patrol car. Trooper Amundson handed Iturbe-Gonzalez the warning card and returned Iturbe-Gonzalez's driver's license, registration, and insurance card. He told him to pay closer attention to the signs and to have a safe trip. The two shook hands again, and Iturbe-Gonzalez said that it was nice to meet Officer Amundson. Officer Amundson asked if Iturbe-Gonzalez was driving all

6

night in order to get to his destination that night. Iturbe-Gonzalez explained that he did not drive at night. Trooper Amundson asked if Iturbe-Gonzalez was going to get a room. Iturbe-Gonzalez said that he was going to try to make it Dickinson, North Dakota. Twenty-seven minutes elapsed from the time that Iturbe-Gonzalez's vehicle stopped to this point.

Trooper Amundson then said, "I have a question, do you have a minute." Without hesitation, Iturbe-Gonzalez responded, "Yes." (Ex. I at 28 min.) Trooper Amundson told Iturbe-Gonzalez that in his record it looked like Iturbe-Gonzalez had a drug arrest in 2012 in California. Trooper Amundson asked what had happened on that instance. Iturbe-Gonzalez responded that he was staying at the house of a friend, but that it was no problem. Trooper Amundson responded that the record indicated that Iturbe-Gonzalez had been in possession of a weapon. Because of apparent miscommunication, Iturbe-Gonzalez responded that he did not have a weapon, only one little knife with him. Trooper Amundson then asked if Iturbe-Gonzalez had any drugs in his vehicle. Iturbe-Gonzalez denied having any drugs in his car. Trooper Amundson then asked whether he had cocaine in the vehicle. Iturbe-Gonzalez claimed that he had nothing. Trooper Amundson asked if he had any "mota" (Spanish for marijuana) in the vehicle. Iturbe-Gonzalez laughed and said, no, he did not like marijuana. Trooper Amundson asked if he

7

had any prescription medications in the vehicle and Iturbe-Gonzalez responded no. Trooper Amundson asked if he had any methamphetamines in the car, and Iturbe-Gonzalez said no. Trooper Amundsen asked if he had any large sums of money in the vehicle. Iturbe-Gonzalez responded no. Trooper Amundson asked how much money he had in the vehicle and Iturbe-Gonzalez responded that he had $4,000 in the car and credit cards. Trooper Amundson asked what the money was for and Iturbe-Gonzalez responded that it was for travel and that he had taken all of his money with him. Trooper Amundson asked again about the prior arrest and what drugs he had been accused of having at that time. Iturbe-Gonzalez said that he was accused of having methamphetamine. Trooper Amundson asked if Iturbe-Gonzalez just happened to be at a house where his friends had durgs. Iturbe-Gonzalez responded that yes, the drugs had belonged to his friends. Trooper Amundson asked how much drugs were taken and Iturbe-Gonzalez responded that he did not know. Trooper Amundson asked once more whether Iturbe-Gonzalez had any drugs in his automobile and Iturbe-Gonzalez responded no. During this series of questions, Trooper Amundson's method of questioning, tone and volume did not change from the earlier exchange with Iturbe-Gonzalez. It remained conversational in nature.

 Trooper Amundson then asked if it would be alright if his partner ran the K-

9 around the outside of Iturbe-Gonzalez's vehicle. Iturbe-Gonzalez responded, "Yes, go ahead." (Ex. I at 31 min.) Trooper Amundson asked again if it would be okay to run the dog around the car and Iturbe-Gonzalez said again that it was okay. The period of time between when Iturbe-Gonzalez consented to answering Trooper Amundson's question and when Iturbe-Gonzalez consented to the drug dog sniff was three minutes.

Trooper Amundson then explained to Deputy Johnson that he did not have consent to do an internal search, only an exterior dog sniff. The K-9 search team then conducted the exterior dog sniff, and the dog positively alerted on the vehicle for illegal drugs.

Trooper Amundson then asked for consent to search the interior of the vehicle and Iturbe-Gonzalez refused consent. Soon thereafter, Trooper Amundson decided to seize the vehicle and called for a wrecker. A subsequent search of the Mitsubishi, pursuant to a search warrant, resulted in the seizure of approximately 16 pounds of cocaine, over four pounds of methamphetamine, and over four pounds of heroin, which was carefully concealed in two hidden compartments under the driver and fron passenger seats.

Iturbe-Gonzalez filed the instant motion to suppress on March 26, 2015, and the motion was fully briefed on April 16, 2015.

## Discussion

Iturbe-Gonzalez contends that the results of the search must be suppressed because (1) Iturbe-Gonzalez was seized and subjected to repeated questioning without being *Mirandized*, and (2) the stop was unlawfully prolonged without reasonable suspicion. The Court denies the motion because the initial seizure and all questioning during the first twenty-seven minutes of the encounter was either necessary to complete the mission of addressing the traffic violation, or did not measurably prolong the stop, and, after the twenty-seven minute mark, all of Iturbe-Gonzalez's interactions with the officers were consensual, until such time as the officers had probable cause to seize and search his vehicle. Furthermore, the Court concludes that not until sometime after the dog had positively alerted on his vehicle was Iturbe-Gonzalez in custody for purposes of Miranda, and therefore, no Miranda warnings were required.[2] Accordingly, the Court denies the motion to suppress.

---

[2] The motion to suppress does not specifically identify at what point Iturbe-Gonzalez believes he should have been *Mirandized*. The Court is therefore left guessing. Critically, however, for purposes of Iturbe-Gonzalez's motion, which seeks suppression of all of the evidence obtained as a result of a search of the vehicle, the Court concludes that no Miranda warnings were required prior to the time at which the dog positively alerted for the presence of illegal drugs. At that point, the officers had probable cause to search the vehicle, *U.S. v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993), and the search warrant which authorized a search of the vehicle is therefore valid. The focus of the Court's analysis is thus on whether there was a need for Miranda warnings before the dog sniff.

The Fourth Amendment to the United States Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV.

"[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *U.S. v Mendenhall*, 446 U.S. 544, 553-554 (1980). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554. To determine if a person has been seized for Fourth Amendment purposes, a court must look to the totality of the circumstances surrounding the incident to determine whether "a reasonable person would have believed that he was not free to leave." *Id.*

"[T]he usual traffic stop is more analogous to a so-called 'Terry stop,' see

*Terry v. Ohio*, 392 U.S. 1 (1968), than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). The United States Supreme Court succinctly described the seizure entailed in a traffic stop in *Arizona v. Johnson*, 555 U.S. 323 (2009)("*Johnson*"):

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

*Id.* at 333 (internal citations omitted.)

After briefing on the instant motion was completed, the United States Supreme Court announced its decision in *Rodriguez v. United States*, 2015 WL 1780927, 575 U.S. \_\_\_ (April 21, 2015), which further details the lawful scope of a traffic stop. Consistent with *Johnson*, the *Rodriguez* Court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id.* at *5 (internal citations omitted.) Thus, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful

traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* Accordingly, the *Rodriguez* Court held that prolonging a traffic stop for seven minutes beyond the time required to address the traffic violation for the purpose of performing a drug dog sniff violated the Fourth Amendment's shield against unreasonable seizures when the officers lacked reasonable suspicion or consent to prolong the seizure. *Id.* at *3.

Ordinarily, a person's detention and questioning during a traffic stop does not raise the concerns of coercion to the degree that Miranda warnings are required to be given in order to preserve the Fifth Amendment privilege against self-incrimination. *Berkemer*, 468 U.S. at 437-440. However, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." *Id.* at 440.

Iturbe-Gonzalez contends that he should have been *Mirandized* at some point in the encounter and that the stop was impermissibly prolonged. Because the issues are inter-related, the Court will address the issues as the arise the various phases of the encounter.

Though not specifically argued, Trooper Amundson did not need to

13

*Mirandize* Iturbe-Gonzalez during the twenty-seven minute period during which he diligently worked to process the traffic violation. Perhaps it could be argued that the need to issue Miranda warnings arose when Trooper Amundson asked that Iturbe-Gonzalez sit inside the patrol car while he worked on the warning card, instead of allowing Iturbe-Gonzalez to remain in his own vehicle. But, even in the patrol car, the coercive concerns that motivate the need to issue Miranda warnings were not present. The conversation between the two men was casual and all the while it was clear to Iturbe-Gonzalez that his detention for the traffic violation would be temporary. *See Berkemer*, 468 U.S. at 437-438. Moreover, though Iturbe-Gonzalez was inside the patrol car, the traffic stop was "public, at least to some degree." *Id.* at 438. Iturbe-Gonzalez also was not surrounded by several officers, or forced to sit in the back seat of the vehicle where exit was not an option. Instead, Iturbe-Gonzalez sat in the front seat, adjacent to Trooper Amundson, and engaged in generally friendly conversation on topics ranging from his interest in body building and mixed martial arts, to his familial relations, to his travel plans. The fact that Iturbe-Gonzalez was seated in the patrol car did not take this encounter outside of the scope of the "ordinary traffic stop [that] is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda*." *Id.* at 439. Thus, no Miranda warnings were

required during the first twenty-seven minutes of the encounter while Iturbe-Gonzalez spoke with Trooper Amundson while the traffic ticket was processed.

Trooper Amundson, furthermore, was free to inquire about unrelated matters while processing the warning card so long as these inquiries did not measurably prolong the stop. *Rodriguez*, 2015 WL 1780927, *5. The majority of the interaction inside of the police vehicle occurred while Trooper Amundson waited for a return on the records check. As a records check is part of the "ordinary inquiries incident to [the traffic] stop," *id.* at *6 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005), Iturbe-Gonzalez cannot complain about any of the inquiries posed to him during this period, because these inquiries into unrelated matters did not measurably prolong the stop. Furthermore, all of the questions Trooper Amundson asked in the five minutes prior to requesting the records check were asked while Trooper Amundson examined Iturbe-Gonzalez's driver's license, registration, and insurance cards, and were either directly related to these documents or were permissible traffic safety-related inquiries of a general nature, which included Iturbe-Gonzalez's travel plans and travel objectives. Such questions are permissible under *Rodriguez*, see *id.* at *3, and any suggestion to the contrary would ask that officers issuing traffic violations temporarily become traffic ticket automatons while processing a traffic violation, as opposed to human

15

beings. *See also Hibel v. Sixth Judicial Dist. Court of Nevada, Humbold County*, 542 U.S. 177, 185 (2004)("Asking questions is an essential part of police investigations.") Accordingly, the Court concludes that this portion of the detention was not unreasonably prolonged.

Trooper Amundson also did not need to *Mirandize* Iturbe-Gonzalez after issuing him the traffic warning and before asking him additional questions because Iturbe-Gonzalez was free to leave at that point and the encounter thus became consensual. Not only was Iturbe-Gonzalez not in custody for purposes of Miranda, he was not seized under the Fourth Amendment. Accordingly, Trooper Amundson did not need to *Mirandize* Iturbe-Gonzalez after issuing the warning citation, nor did he need reasonable suspicion to perform the additional questioning.

Before asking Iturbe-Gonzalez any questions unrelated to the traffic violation, Trooper Amundson returned all of Iturbe-Gonzalez's documents to him and told him to have a safe trip. The two men then shook hands, and Iturbe-Gonzalez told Trooper Amundson that it was nice to meet him. Trooper Amundson then said, "I have a question, do you have a minute?" (Ex. I at 27 min.) Iturbe-Gonzalez responded, "Yes." *Id.*

The questioning that followed, on the side of a public highway in broad

daylight, lasted approximately three minutes during which time Iturbe-Gonzalez freely answered Trooper Amundson's questions "voluntarily in a spirit of apparent cooperation." *Mendenhall*, 446 U.S. at 576 (quoting *Sibron v. New York*, 392 U.S. 40, 63 (1968)). At no point did Trooper Amundson physically touch Iturbe-Gonzalez, instruct him to stand in a particular place, position himself between Iturbe-Gonzalez and his vehicle, or employ a tone of voice that would suggest that Iturbe-Gonzalez was compelled to answer. *See id.* at 554. The only limited fluctuation in Trooper Amundson's tone arose in the context of a temporary miscommunication between the two men due to Iturbe-Gonzalez's imperfect command of English, but nothing that Trooper Amundson did or said objectively suggested that Iturbe-Gonzalez was not free to leave, and the fact of Iturbe-Gonzalez's imperfect English does not override all of these other factors. Examining the totality of the circumstances surrounding the incident, the Court concludes that a reasonable person would have believed that he was free to disregard the questions and walk away. *A fortiori*, Iturbe-Gonzalez was not in custody such that Miranda warnings were required.

Iturbe-Gonzalez also freely consented to the exterior dog sniff of his vehicle, not just once, but twice. Thus, any additional delay caused by the performance of the dog sniff was permissible under *Rodriguez* because Iturbe-

17

Gonzalez consented to it. And once the dog positively alerted to the presence of illegal drugs inside the vehicle, the reliability of which is not challenged, the officers had probable cause to search and seize the vehicle. *U.S. v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir. 1993).

One final component of the encounter must arguably be examined after *Rodriguez*. After receiving the return on the records check, Trooper Amundson contacted county dispatch to request a K-9 assist. This effort took Trooper Amundson approximately thirty seconds. While Trooper Amundson finished work on the warning citation, he received a call from Deputy Johnson. Trooper Amundson explained to Deputy Johnson that he had pulled over a person who was traveling from Seattle to North Dakota without a lot of details about why he was headed there and that the individual had a recent prior arrest for drug trafficking. Trooper Amundson indicated only that he might not need a dog and that he would contact Deputy Johnson again if it appeared that he did need a dog. Deputy Johnson offered to go ahead and come over because he was close by and not busy. This conversation lasted less than a minute.

In general, the Court is not inclined to micro-manage this miniscule period of time to determine if reasonable suspicion justified this, arguably, additional period of the traffic stop. *See United States v. Turvin*, 517 F.3d 1097, 1102 (9th

Cir. 2008) (approving of Tenth Circuit's decision in *United States v. Patterson*, 472 F.3d 767, 776 (10th Cir. 2006) in which it declined "to make a time and motion study of traffic stops."). The Court wonders if perhaps Trooper Amundson, while conversing with Deputy Johnson and/or county dispatch about a *potential* request for a K-9 assist, may have simultaneously reached for a pen to finalize his work on the warning citation, checked one last box on the warning form, or checked to see that he had all he needed for his personal safety before he exited his vehicle to address Iturbe-Gonzalez for purposes of issuing the warning, or, if perhaps he did all of the above.

Nonetheless, if reasonable suspicion was actually or arguably required under *Rodriguez* to warrant this very minor addition to the stop, the Court finds that sufficient reasonable suspicion existed to justify this additional minimal intrusion on Iturbe-Gonzalez's liberty, based on the following objective and particularized facts: (1) the recent prior arrest for possession of narcotics, possession with intent to distribute, and possession while armed; (2) the lack of details that Iturbe-Gonzalez could supply about his travel plans; (3) the apparent inconsistencies between Iturbe-Gonzalez's purported objectives and his appearance, the appearance of his vehicle, and the luggage he carried with him; and (4) the fact that the vehicle was registered in another person's name and

19

Iturbe-Gonzalez could supply only an expired California driver's license application when he had ostensibly been living in the state of Washington for the past two years. *See U.S. v. Sokolow*, 490 U.S. 1, 7-8 (1989).

In conclusion, because prior to the positive dog alert Iturbe-Gonzalez was not in custody for purposes of Miranda, no Miranda warnings were required to be given. Furthermore, because Iturbe-Gonzalez consented to all of the inquiries posed to him that were unrelated to the mission of addressing the traffic infraction, the stop was not measurably prolonged, and its length was justified. Finally, to the extent that Trooper Amundson required reasonable suspicion for the very minor extension of the stop caused by his call to request a potential K-9 assist, that minimal intrusion on Iturbe-Gonzalez's liberty was justified by sufficient reasonable suspicion.

IT IS ORDERED that the motion to suppress (Doc. 18) is DENIED.

DATED this 23rd day of April 2015.

/s/ Dana L. Christensen
Dana L. Christensen, Chief District Judge
United States District Court